Clarence HOOKS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Sterling HOBBS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Wilbur JOHNSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Robert GOLSON, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted June 11, 1979.

Decided May 30, 1980.

J. Dallas Winslow, Jr., Chief Deputy Public Defender, and Richard E. Fairbanks, Jr., Asst. Public Defender, Wilmington, for defendants-appellants.

F. L. Peter Stone of Connolly, Bove & Lodge, Wilmington, for Clarence Hooks, Sterling Hobbs and Wilbur Johnson, defendants-appellants.

Bartholomew J. Dalton and Kathleen Molyneux, Deputy Attys. Gen., Wilmington, for plaintiff-appellee.

Before DUFFY, QUILLEN and HORSEY, JJ.

## I

QUILLEN, Justice:

We initially state the nature of the proceedings with heavy reliance on the appellants' opening brief.

Robert Golson, Sterling Hobbs, Clarence Hooks and Wilbur Johnson were indicted by the Grand Jury and charged with Murder in the first degree, Robbery in the first degree, and Conspiracy in the second degree. Sterling Hobbs was also charged with Possession of a Deadly Weapon during the Commission of a Felony. Defendants Hobbs, Hooks and Johnson moved for severance. The Superior Court denied this request. Defendants were arraigned and jury selection began immediately thereafter. After a lengthy trial, all defendants were found guilty as charged. The defendants' motions for a new trial were denied.

Robert Golson was sentenced to death on the charge of Murder in the first degree. He was sentenced to thirty years in prison on the charge of Robbery in the first degree. He was sentenced to seven years on the charge of Conspiracy in the second degree.

Sterling Hobbs was sentenced to death on the charge of Murder in the first degree. He was sentenced to thirty years in prison on the charge of Robbery in the first degree. He was sentenced to seven years on the charge of Conspiracy in the second degree. He was sentenced to thirty years in prison on the charge of Possession of a Deadly Weapon during the Commission of a Felony.

Clarence Hooks was sentenced to death on the charge of Murder in the first degree. He was sentenced to thirty years in prison on the charge of Robbery in the first degree. He was sentenced to seven years in prison on the charge of Conspiracy in the second degree.

Wilbur Johnson was sentenced to death on the charge of Murder in the first degree. He was sentenced to thirty years in prison on the charge of Robbery in the first degree. He was sentenced to seven years on the charge of Conspiracy in the second degree.

This Court has heard an appeal regarding the sentence of death to be imposed for the charge of Murder in the first degree. In *State v. Spence*, Del.Supr., 367 A.2d 983 (1976), the Court ruled that, under standards established by the United States Supreme Court, the sentence of death as applied in these cases constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. The Court ruled that the sentence to be imposed in this case for Murder in the first degree is life imprisonment without benefit of parole under 11 *Del.C.* § 4209(a) (1974). *Id.* at 989.

## II

The event out of which these charges and convictions arose occurred on May 5, 1975. Ridge Liquors, located in Claymont, Delaware, was robbed of approximately $200. During the robbery, Philip Whiteman, a store clerk, was shot by a .22 caliber handgun and killed. Five men were arrested for this crime. Four of these men have been charged and convicted in this case; their appeals are currently before this Court. The fifth man, Gregory Payne, pled guilty to First Degree Robbery and received a twenty-year prison sentence. During the trial he testified for the State against the four defendants.

## III

Defendants raise numerous issues in this appeal. We consider first the issues relating to matters prior to the taking of evidence and second the trial and related legal issues. We affirm the convictions.

## IV

Appellants claim that the Trial Court committed reversible error in its conduct of the voir dire process. Appellants Hooks, Hobbs and Johnson, challenge the handling of the voir dire on the following grounds. They claim that the systematic exclusion of prospective jurors with conscientious scruples against the imposition of capital punishment led to the seating of an unrepresentative jury, in violation of the Sixth and Fourteenth Amendments. They also claim that the Trial Court showed insufficient concern in its questioning of prospective jurors as to whether they held a bias against Blacks and persons of the Black Muslim faith. Appellants further argue that even if taken separately these deficiencies in the voir dire process do not constitute reversible error, their cumulative effect was so prejudical to appellants as to mandate reversal.

■ The case of *Parson v. State*, Del. Supr., 275 A.2d 777 (1971), establishes that the Trial Judge has broad discretion in conducting the voir dire, and that reversible error exists only if this discretion has been abused, to appellants' prejudice.

In examining the Trial Court's questioning of prospective jurors to determine their attitude toward capital punishment, we note that the Delaware statute regarding voir dire in capital cases[1] follows very closely the rule laid down in *Witherspoon v. Illinios*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) concerning when a juror should be challenged for cause on the basis of conscientious scruples against capital punishment. In *Witherspoon*, the defendant's sentence of death was overturned because all jurors who had expressed conscientious scruples against capital punishment were stricken from the panel. The resulting sentence was held constitutionally infirm as having been arrived at by a jury that was not impartial but rather heavily weighted in favor of the death sentence, in violation of the Sixth and Fourteenth Amendments. The Illinois statute in *Witherspoon* permitted this by allowing removal of all scrupled jurors for cause, and the Court noted that by excluding them Illinois had kept out even those who despite their scruples would be able to decide the issue of guilt fairly based on the evidence presented. Thus, the *Witherspoon* standard that only those jurors who would be unable to render an impartial verdict because of their opposition to capital punishment could be excused for cause, was developed. The standard was reaffirmed recently in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Our similar statute was held constitutional in *Steigler v. State*, Del.Supr., 277 A.2d 662 (1971).

■ After a review of the voir dire questioning we have concluded that the Trial Court adhered painstakingly to the *Witherspoon* standard. He questioned each juror in such a way as to discover whether his attitude toward capital punishment would prevent him from reaching a verdict on the evidence. Jurors who said they could not

---

1. 11 *Del.C.* § 3301 provides:

"§ 3301. Examination upon voir dire in capital cases.

"When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him, or unless he shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, not withstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused."

return a guilty verdict in any case if they knew the penalty would be death were removed for cause. See *Parson v. State, supra,* 275 A.2d at 784–785. Some jurors whose answers were ambiguous became the subject of the State's peremptory challenges, but there was no impropriety in the State's exercise of its challenges in this way.

 Appellants have asked this Court to go beyond the *Witherspoon* standard to consider a question that was left open in the *Witherspoon* decision. They claim that in the process of picking a jury where those with conscientious scruples against capital punishment are excluded a conviction-prone jury is inevitably formed. The *Witherspoon* Court refused to rule that the jury there was biased towards conviction even if the weeding out of capital punishment foes did make the resulting jury more likely to impose the death sentence. The Court said that evidence that this produced a conviction-prone jury was tentative and fragmentary. Appellants argue that the evidence is now stronger and more cohesive, thus the time is ripe for a re-evaluation of this claim.

Appellants have cited more recent studies than those that were before the Supreme Court in *Witherspoon.*[2] Since that decision, many of these studies have been urged upon federal and state courts as a basis for finding that the juries selected were prosecution oriented. None of these studies were based on an actual trial proceeding; rather, they were based on individual questioning without the factors of group interaction and responsibility that accompany the operation of a jury. For this reason and others based on methodological matters these studies have been rejected as inconclusive. See, e. g., *Spinkellink v. Wainwright,* 5th Cir., 578 F.2d 582 (1978), reh. den. 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979); *United States ex rel. Clarke v. Fike,* 7th Cir., 538 F.2d 750 (1976), cert. den. 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977); *Craig v. Wyse,* D.Colo., 373 F.Supp. 1008 (1974). We decline to depart at this time from a decision that has stood up to these subsequent challenges.[3]

Appellants' other grounds for challenging the Trial Court's conduct of the voir dire pertain to the Court's efforts to ferret out prospective jurors who maintained a bias against Blacks or Black Muslims. Appellants claim that the Trial Court's efforts in this regard were superficial and wholly inadequate.

 While reasonable minds might draw the line differently, we find no abuse of discretion by the Trial Judge. The Trial Court's discretion on voir dire is restricted only by essential demands of fairness. *Shields v. State,* Del.Supr., 374 A.2d 816 (1977), cert.den. 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180 (1977). While this discretion is constrained by the requirement that a trial judge inquire into racial bias when

2. See e. g.: Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 U.Col.L.Rev. 1 (1970); Goldberg, *Toward Expansion of Witherspoon: Capital Punishment Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law,* 5 Harv. Civ. Rights—Civ.L.Rev. 53 (1970); Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971); White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries,* 58 Cornell L.Rev. 1176, 1182 (1973); Note, 37 U.Chi.L. Rev. 759, 775–76; Comment, 1969 Utah L.Rev. 154.

3. The recent decision of the Federal District Court of Arkansas in *Grigsby v. Mabry,* E.D. Ark., 1980, 483 F.Supp. 1372, does not alter our evaluation. There, the Court ruled in a habeas corpus proceeding that the Arkansas state trial court should have granted petitioner's request for a continuance so that he might have the chance to develop the evidentiary showing of the guilt proneness of a "death-qualified" jury. The Court stated that the evidence at this date is "considerably less fragmentary and tentative than it was in 1968 when *Witherspoon* was decided," *Grigsby, supra,* 483 F.Supp. at 1388, and that petitioner's constitutional right to an impartial jury was seriously denigrated by the refusal, which therefore amounted to an abuse of discretion. We think that case addressed a more compelling situation, where a murder defendant was deprived of the right to make an evidentiary showing at trial, and the Court went no further than to rule that such a showing could be made with the recent studies.

requested to do so, *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), the Court below properly exercised its discretion. The jurors were asked whether or not they felt any bias against Blacks or Black Muslims. Jurors who indicated prejudice were excused for cause.

■ Nor are we presented with an instance of the systematic exclusion of Black jurors. The appellants have not made a showing that the State used its peremptory challenges towards a "purposeful, deliberate exclusion of black people," *Johnson v. State,* Del.Supr., 312 A.2d 630, 631 (1973) or that it challenged jurors "on the sole ground of group bias." *Saunders v. State,* Del.Supr., 401 A.2d 629, 632 (1979). Absent such a showing we may only conclude that the State used its peremptory challenges properly within its power.

■ Appellants' final contention is that the Trial Court committed reversible error by failing to afford appellants Hooks, Hobbs and Johnson separate trials. Appellants claim that the appellants' respective positions were at such cross purposes as to make a joint trial inherently prejudicial.

Appellants' claim does not stand up under scrutiny they had urged in the motion for severance that the State's use of a statement made by the fourth appellant, Golson, would present a *Bruton* problem.[4] This problem was rendered moot by the State's failure to submit the particular Golson statement to the jury. In addition, the Trial Court does not appear to have abused its discretion in holding that "the other claims of prejudice [stemming from a refusal to sever] are unsupported or speculative." Insofar as the "abuse of discretion" standard frames our analysis of this problem, *Burton v. State,* Del.Supr., 1 Storey 546, 149 A.2d 337 (1959), we decline to overturn the Trial Court's holding on this point.

## V

We now turn to eight other trial context issues raised by the appellants. We will discuss them sequentially.

### A

■ Appellants' first claim is that they cannot be found guilty as accomplices to Murder in the first degree under 11 *Del.C.* § 636(a)(2), our felony-murder statute, for an act committed by another person. Our accomplice statute, 11 *Del.C.* § 271, provides in pertinent part:

"§ 271. Liability for the conduct of another—Generally.

"A person is guilty of an offense committed by another person when:

* * * * * *

"(2) Intending to promote or facilitate the commission of the offense he:

* * * * * *

"b. Aids, counsels or agrees or attempts to aid the other person in planning or committing it . . . ."

The crux of defendants' argument is that the killing charged here involved a reckless state of mind. The indictment so alleged, and that is the state of mind that § 636(a)(2) requires.[5] Therefore, they argue, it cannot be said that they had the necessary mental state of intent which is essential to accomplice liability under 11 *Del.C.* § 271. Furthermore, defendants argue since the Code abandons any distinction between principal and accomplice [see commentary to § 271 and 11 *Del.C.* § 275] and since the Trial Court's instructions did not

---

4. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.E.2d 476 (1968) was addressed to the problems inherent in a situation where the statement of one co-defendant inculpating the other co-defendant was introduced in a trial where the declarant did not take the stand and could not be cross-examined. This was held to violate the implicated codefendant's Sixth Amendment right to confront witnesses.

5. The statute provides:

"§ 636. Murder in the first degree; class A felony.

"(a) A person is guilty of murder in the first degree when:

* * * * * *

"(2) In the course of and in furtherance of the commission or attempted commission of a felony or *immediate flight therefrom,* he recklessly causes the death of another person . . . ."

require a specific finding as to whose conduct directly caused the death of Philip Whiteman, the alleged defect exists as to each of the four defendants.

Defendants misconstrue the nature of the intent required. The inquiry under § 271 is not whether each accomplice had the specific intent to commit murder, but whether he intended to promote or facilitate the principal's conduct constituting the offense. The defendants did not have to specifically intend that the result, a killing, should occur. As long as the result was a foreseeable consequence of the underlying felonious conduct their intent as accomplices includes the intent to facilitate the happening of this result. The defendants concede that such liability existed under common law and under prior Delaware law. See *State v. Winsett*, Del.Super., 205 A.2d 510, 516 (1964) and *State v. Norris*, Del.Gen.Sess., 6 Terry 267, 71 A.2d 755, 757 (1950). We do not find any legislative intent to make our law less strict.

The Commentary to the Model Penal Code provision on accomplice liability, from which the Delaware statute was drawn, with certain omissions, states that:

" . . . one may . . . be an accomplice in crimes of recklessness or negligence if, with the requisite knowledge, he commands or assists in performing the behavior that is reckless or negligent . . . ." Model Penal Code § 2.04(3), Comment at 26, n.28 (Tent.Draft No. 1, 1953)

"The draft confines the scope of liability to crimes that the accomplice had the purpose of promoting or facilitating. This does not mean, of course, that the precise means used in the commission of a crime must have been fixed or contemplated or, when they are, that liability is limited to their employment. One who commands, requests, encourages or aids in the achievement of the end is an accomplice *in whatever means may be employed, in so far as they constitute or commit an offense fairly envisaged in the contemplation of the end.* But when a wholly different crime has been committed, involving conduct not thus in the range of contemplation, the accomplice is not liable unless the case falls within the specific terms of paragraph (4)." [The provision omitted by the Delaware Statute.] [Emphasis supplied.] Model Penal Code, *supra*, at 24.

Clearly this language envisions such a situation as the one at bar, where all the defendants knew that guns were to be carried and if necessary used in the course of the robbery. Therefore, under the evidence, including the use of guns to aid the criminal activity, appellants could be found guilty as accomplices to first degree felony murder committed by the act of another person.

**B**

Next, appellants argue that the Trial Court erred by (1) denying appellants Johnson and Hobbs the option of representing themselves rather than relying on counsel, in that the Court refused to provide them access to materials necessary for self-representation, and (2) not permitting appellants Johnson and Hobbs to serve as co-counsel with their respective appointed counsel.

 The federal constitution guarantees the right of self-representation, just as it guarantees the right to be represented by counsel, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, this right may only be invoked when the defendant has made a knowing and intelligent waiver of the right to counsel and the record must show that the defendant has clearly and unequivocally made his choice. *Faretta, supra*, 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d 581–582; *United States ex rel. Martinez v. Thomas*, 2d Cir., 526 F.2d 750, 755 (1975); *United States v. White*, D.C.Cir., 429 F.2d 711, 712 (1970); *United States ex rel. Maldonato v. Denno*, 2d Cir., 348 F.2d 12, 15 (1965), cert. den. 384 U.S. 1007, 86 S.Ct. 1950, 16 L.Ed.2d 1020 (1966); *People v. McFerran*, Cal.Dist.Ct. App., 211 Cal.App.2d 4, 26 Cal.Rptr. 914, 916 (1962). Here, the record shows no such clear and unequivocal waiver of the right to counsel; therefore the Trial Court correctly

denied appellants' request to represent themselves. See *Payne v. State*, Del.Supr., 367 A.2d 1010, 1015–16 (1976).

As to the assertion that defendants were entitled to co-counsel status with their respective appointed counsel in their own defense, appellants claim that this is a right of constitutional magnitude under both the Federal and Delaware Constitutions.

Cases interpreting federal constitutional law on this point have overwhelmingly declared that there is no constitutional right for a defendant to be appointed as co-counsel. See e. g., *United States v. Williams*, 8th Cir., 534 F.2d 119 (1976), cert. den. 429 U.S. 894, 97 S.Ct. 255, 50 L.Ed.2d 177 (1976); *United States v. Hill*, 10th Cir., 526 F.2d 1019 (1975), cert. den. 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976); *United States v. Wolfish*, 2d Cir., 525 F.2d 457 (1975), cert. den. 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976); *Brasier v. Jeary*, 8th Cir., 256 F.2d 474 (1958), cert. den. 358 U.S. 867, 79 S.Ct. 97, 3 L.Ed.2d 99 (1958), reh. den. 358 U.S. 923, 79 S.Ct. 286, 3 L.Ed.2d 242 (1958); *Goodspeed v. Estelle*, N.D.Tex., 436 F.Supp. 1383 (1977); *United States v. Swinton*, S.D.N.Y., 400 F.Supp. 805 (1975); *Callahan v. State*, Md.Ct.Spec.App., 30 Md. App. 628, 354 A.2d 191 (1976); *State v. McCleary*, N.J.Super., App.Div., 149 N.J.Super. 77, 373 A.2d 400 (1977). *Faretta* itself did not speak to this issue, apart from a passing reference to the State's right in a criminal prosecution to appoint "standby counsel" in case necessitous circumstances should arise. *Faretta, supra*, 422 U.S. at 834, n. 46, 95 S.Ct. at 2541, 45 L.Ed.2d at 581, and *Faretta* is considered not to have altered pre-existing law on this point. *Hill, supra*, 526 F.2d at 1024, *Swinton, supra*, 400 F.Supp. at 806; see also *People v. McDaniel*, Cal.Supr., 16 Cal.3d 156, 127 Cal.Rptr. 467, 474, n.6, 545 P.2d 843, 850, n. 6 (1976) (en banc), cert. den. 429 U.S. 847, 97 S.Ct. 131, 50 L.Ed.2d 119 (1976). Having determined that a defendant's right to either self-representation or counsel is protected by the Sixth Amendment, no right to "hybrid" representation exists. Generally on appeal, the courts have analyzed the kind of claim made by these defendants in terms of whether the trial courts have abused their sound discretion, in their role of conducting an orderly trial, by not granting the request to participate as co-counsel. See e. g., *Williams, supra*, 534 F.2d at 123; *Hill, supra*, 526 F.2d at 1024–25; *Swinton, supra*, 400 F.Supp. at 806; *Callahan, supra*, 354 A.2d at 194–195; *McCleary, supra*, 373 A.2d at 401, and cases there cited. We must view the Trial Court's action here in the same manner. We find no indication that the Court abused its discretion in forcing defendants to make the choice between accepting appointed counsel or conducting their own defense.

Appellants have also sought to rely on the Delaware Constitution, Article I, § 7, as conferring upon a defendant the right to act as co-counsel. That section provides: "[i]n all criminal prosecutions, the accused has a right to be heard by himself and his counsel."

This Court recently considered a challenge under this provision where the defendant, having sought permission to cross-examine a state witness and then changed his mind, allowing his counsel to continue the questioning, claimed that he was denied the right to self-representation. Justice Duffy, speaking for the Court, stated:

"As to the Delaware Constitution, there appears to be little if anything in either the Constitutional Debates or the cases which would be helpful in construing what is meant by the right to be heard by one's self *and* by counsel. But this case does not require a full exploration thereof. We hold only that, considering the circumstances under which the defendant sought to cross-examine a witness almost at the end of the State's case and, in the absence of any showing of prejudice, he was not deprived of any constitutional right by the Court's ruling" [emphasis in original].

*Gibbs v. State*, Del.Supr., 359 A.2d 164, 166 (1976).

Here, we reject an interpretation that this language confers a right to representation and self-representation simultaneously.

Historical sources verify that both these rights were of paramount importance in the original colonies in their constitutions and laws, each for different reasons, in reaction to practices in England. See Note, 61 Cornell L.Rev. 1019, 1022–1024 (1976). In the courts of the King an accused was afforded counsel only in rare cases, while in the Star Chamber, a defendant was forced to accept representation by counsel whose object was to avoid the disapprobation which would follow if anything in the defendant's answer to the indictment offended the Crown. 61 Cornell L.Rev. at 1023–24, nn. 26–28. This latter situation served to fuel the Colonists' interest in establishing the right to self-representation, *Faretta, supra,* 422 U.S. at 828–829, nn. 37–39, 95 S.Ct. at 2538–39, 45 L.Ed.2d at 578–579; indeed, the right to counsel was thought to be a supplement to the accused's right to defend himself. *Id.* This State recognized a right to appointed counsel in 1719:

> "And that upon all trials of the said capital crimes, lawful challenges shall be allowed, and learned counsel assigned to the prisoners, and shall have process to compel witnesses to appear for them upon any of the said trials . . . "

1 *Del.Laws,* Ch. 22(a), § 4(d), and again in 1776, the Delaware Declaration of Rights, § 14, proclaimed the right "to be allowed counsel." 1 *Del.Laws,* Appendix, p. 81. Thus it is clear the Constitutional provision was addressed to securing both of these equally important fundamental rights. But we are not persuaded that a hybrid representation arrangement would be in any way consistent with or of assistance to the framers' original intent. The discussion in *Faretta* clearly shows that the states envisioned the right to counsel as an adjunct to the ever-present right to self-representation, available if the defendant wishes to make use of it.

In California, with a similar constitutional[6] and statutory provision,[7] the law, both pre- and post-*Faretta* has been, as stated in *People v. Mattson,* Cal.Supr., 51 Cal.2d 777, 336 P.2d 937, 946 (1959) (en banc):

> "[D]espite the constitutional (art. I, § 13) and statutory (Pen.Code, § 686) provisions that defendant has the right to appear and defend in person *and* with counsel, defendant is not entitled to have his case *presented* in court *both by himself and by counsel* acting at the same time or alternating at defendant's pleasure [emphasis in original] [citations omitted]. So long as defendant is represented by counsel at the trial, he has no right to be heard by himself [citations omitted]."

See also *Chaleff v. Superior Court for Los Angeles County,* Cal.Ct.App. 69 Cal.App.3d 721, 138 Cal.Rptr. 735, 739–41 (1977); *People v. Sharp,* Cal.Supr., 7 Cal.3d 448, 103 Cal.Rptr. 233, 499 P.2d 489 (1972) (en banc), cert. den. 410 U.S. 944, 93 S.Ct. 1380, 35 L.Ed.2d 610 (1973); *People v. Hill,* Cal. Supr., 70 Cal.2d 678, 76 Cal.Rptr. 225, 452 P.2d 329 (1969) (en banc), cert. den. 406 U.S. 971, 92 S.Ct. 2416, 32 L.Ed.2d 671 (1972).

We feel this result is compelled in the case at bar out of concern both for our constitutional scheme and the sound and orderly administration of justice. See *Fowler v. State,* Okla.Ct.Crim.App., 512 P.2d 238 (1973). As with the federal law, the right is not constitutionally guaranteed; co-counsel status may occasionally be granted if the Trial Court within its discretion finds it would be advantageous or helpful, but such was not the case here. Appellants have not shown reversible error.

### C

Appellant Hooks contends that the Trial Court erred by admitting into evidence a statement he had made without the State's having established that he had knowingly

---

**6.** The California Constitution, Article I, § 13, provides:

"In criminal prosecutions, in any court whatever, the party accused shall have the right * * to appear and defend, in person and with counsel."

**7.** California Penal Code § 686 provides:

"In a criminal action the defendant is entitled: * * *

"2. To be allowed counsel as in civil actions, or to appear and defend in person and with counsel."

and intelligently waived his *Miranda*[8] right to remain silent.

 While it is true that the evidence does not show an explicit oral or written waiver of appellant Hooks' *Miranda* rights prior to his making the statement, it is plain from the record that he was aware of his rights, having been informed of them, and had the ability to comprehend them. The absence of an express waiver does not necessarily render a confession inadmissible; other surrounding circumstances can show that a defendant knew of his rights and intelligently waived them. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. Johnson*, 5th Cir., 455 F.2d 311 (1972); *Tilson v. Rose*, E.D.Tenn., 392 F.Supp. 809 (1974). Here, there was more than ample evidence of the defendant's awareness and understanding of his rights and the lack of any impairment of his free will in offering the statement to establish a valid waiver. Thus the Trial Court did not err in admitting Hooks' statement.

### D

Defendants next argue that they should have been allowed to examine prior statements made by prosecution witness, Christopher Jackson. Jackson's statements were made during an interview with Peter Bosch, a Deputy Attorney General, who, according to Jackson's testimony at trial, took notes on what Jackson said and read them back to him, whereupon both were satisfied that the notes were accurate. Defendants argue that, by analogy to the Jencks Act, 18 U.S.C.A. § 3500 (1957), they were entitled to see the prior notes for the purposes of facilitating the search for truth and aiding the defense's efforts at cross-examination and impeachment. See *United States v. Perry*, D.C.Cir., 471 F.2d 1057 (1972); *Commonwealth v. Hamm*, Pa.Supr., 474 Pa. 487, 378 A.2d 1219 (1977).

 It has been the customary practice of the trial courts of this state to follow the *Jencks* rule, first articulated in *Jencks*

*v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), and we take this opportunity to expressly approve the rule and adopt it. Under the rule, the defense, upon demand at the time of cross-examination, is entitled to statements of government witnesses made to governmental agents if the contents thereof relate to the subject matter of the direct examination. In this case, however, we conclude that the *Jencks* rule did not compel the State to produce their summary of Jackson's statement. As noted above, in the federal system, the rule is now controlled by statute and is subject to the narrowing interpretation found in *Palermo v. United States*, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The Supreme Court examined the legislative history of the Jencks Act and found a clear Congressional intent to limit discoverable statements to those produced or recorded by the witness himself, and of those taken by an investigator, only those "which could properly be called the witness' own words". 360 U.S. at 352, 79 S.Ct. at 1224, 3 L.Ed.2d at 1295. Congress by the Act intended to exclude any statement that was a selective or interpretive summary of the witness' words. Indeed, Congress in its debates stressed the necessity of a "substantially verbatim recital." 18 U.S.C.A. § 3500(e)(2); 103 Cong.Rec. 15940; 103 Cong.Rec. 16488 (1957). In adopting the *Jencks* rule, we feel we should be governed by the carefully considered approach now being applied in the federal courts under the statute.

The Trial Court reviewed Mr. Bosch's notes of the Jackson interview *in camera* during a recess of the trial, and ruled that it did not qualify as a statement discoverable under *Jencks*. We have reviewed the transcript of that *in camera* inspection and we find no error in the discretionary ruling of the Trial Court. Moreover, it is difficult to see how any error in this regard could be other than harmless. Nor can the defendants take any comfort from their claim that the notes should have been produced because of their use to refresh recollection

---

**8.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

since that evidentiary claim was not fairly presented to the Trial Judge for the exercise of his discretion. See Federal Rule of Evidence 612 and compare The Delaware Uniform Rules of Evidence, Rule 612(b) (eff. July 1, 1980).

### E

Appellants' fifth claim is that the Trial Court erred by admitting into evidence certain information regarding appellants' previous activities. This claim focuses on three particular incidents from the past.

 First, appellant Golson has challenged as prejudicial the jury's being informed through a witness' voluntary comment that Golson had been incarcerated with the witness in the past. The error was immediately corrected. The Trial Judge instructed the jury that the incarceration resulted from a truancy charge brought against Golson when he was a juvenile, and that the fact of a previous incarceration was irrelevant. This instruction clearly cured any defect that might have otherwise been created by the mentioning of the previous incarceration. *Shields v. State*, Del. Supr., 374 A.2d 816, 821 (1977), cert. den. 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180.

 Second, appellants claim that the Trial Court erroneously admitted evidence of the appellants' plans to rob a rental agency three days before they robbed the Ridge Liquor Store. The appellants first invoke *Johnson v. State*, Del.Supr., 311 A.2d 873 (1973), to argue that evidence of other crimes is inadmissible to prove the commission of the offense at issue. Appellants also claim that the evidence regarding the prior crime was inadmissible insofar as it derived solely from the testimony of one of the accomplices to that crime, who was a "confessed liar." Again, appellants' claim lacks merit. Evidence of the original plans to commit robbery is relevant to the conspiracy charge involved in this case and is also relevant to show the existence of a common scheme, an exception to the principle invoked by appellants. *Bantum v. State*, Del. Supr., 7 Terry 487, 85 A.2d 741 (1952). Consequently, this evidence was properly admitted.

 Finally, appellant Johnson claims that evidence regarding his having fathered children out of wedlock was erroneously admitted. Johnson contends that his character was in issue only as to his credibility and that the matter of his allegedly having fathered children out of wedlock was irrelevant. But the evidence regarding the children was admitted to show bias on the part of one of the witnesses, an alibi witness, and the mother of the children. While the requirement and the degree of a proper foundation are perhaps debatable [see McCormick Handbook of the Law of Evidence (3d ed. 1972) at 79–81], we find sufficient foundation in the cross-examination of the mother and no abuse of discretion by the Trial Judge. Consequently, Johnson's arguments are without merit. *Commonwealth v. Hayward*, Pa.Supr., 437 Pa. 215, 263 A.2d 330 (1970); *Wintjen v. State*, Del. Supr., 398 A.2d 780 (1979).

### F

 Appellant Golson contends that a statement he had written onto a towel while incarcerated, admitting his participation in the robbery but denying that he had killed Whiteman, was erroneously excluded as evidence. Golson's claim appears to be that the remarks he made on the towel were simply a portion of his general statement. He seeks to justify the towel's admission into evidence by relying on the notion that all portions of a statement admitted into evidence must be admitted, even if certain portions are self-serving in nature. In addition, Golson claims that the statement's admission is warranted because it comes within the state of mind exception to the hearsay rule.

Neither of appellant's contentions stands up upon analysis. Golson's statement on the towel is separate and distinct from Golson's admissions to the police. It is not a portion of a general statement or of a related series of statements. In addition, it is not a statement of Golson's relevant then existing state of mind as required to satisfy

the state of mind exception to the hearsay rule. Compare § 803(3) of the Federal Rules of Evidence.

### G

Appellants next claim that the search warrant issued by a magistrate in Pennsylvania to search the Philadelphia residence of defendant Wilbur Johnson was invalid in two respects. Their first objection is that the affidavit supporting the search warrant used to search Johnson's residence does not state the basis for the affiant's information and the conclusions contained therein. The second objection focuses on the alleged failure of the warrant to establish probable cause because of an inadequate factual link between the crime committed in Claymont, Delaware and the residence to be searched in Philadelphia. These issues will be discussed in turn.

The crux of appellants' first argument is that the affidavit fails to state how the affiant, a Philadelphia police officer, got his information. The warrant states that the information stated therein was obtained from several witnesses, all but two of whom were unnamed. The witnesses had spoken to Delaware State Police investigators who relayed their statements to the Philadelphia police. After a further investigation, the Philadelphia officer applied for a search warrant, supporting it with his affidavit. Defendants' contention is essentially that the failure to name the Delaware State Police as the source of the affiant's information is fatal to the warrant.

■ Probable cause for the issuance of a search warrant may be founded on hearsay information provided to the affiant by other officers, government agents, informers or witnesses to the incident. The magistrate's inquiry in such a case should be directed to whether the hearsay declarant was reliable. If so, then the warrant will not be invalidated merely because affiant's information is based on hearsay.

■ Analyzed from the standpoint of reliability, as demanded by *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and its progeny, the hearsay sources of the affiant's information do not raise major substantive problems. Of the witnesses who spoke to the Delaware State Police, those who were named are considered inherently reliable, as a generally established rule, as a source for probable cause. *Wilson v. State*, Del.Supr., 314 A.2d 905, 907 (1973). The citizen-informer is a passive observer with no connection with the underworld, and no reason to fabricate what he has seen or heard, and as such is considered presumptively reliable. The Court of Special Appeals of Maryland, in the well-reasoned opinion, *Warren v. State*, 29 Md.App. 560, 350 A.2d 173 (1976), upheld a warrant sworn out on the basis of an unnamed citizen-eyewitness' identification of the suspect, holding that allegations supplied by ordinary citizens not from the criminal milieu provided a basis for a finding of probable cause. *Id.*, 350 A.2d at 180. We think the attack on the validity of the ultimate source of the affiant's information must fail.

■ There remains the question of whether the warrant was inadequate for failing to indicate that the information was obtained through the investigation of Delaware police officers and other than the Pennsylvania police affiant. Defendant argues that *Aguilar* requires such material to be included for the purpose of determining the existence of probable cause and indeed it would have been preferable had such information been on the face of the warrant. But we do not find that the defect amounts to reversible error. The concern of the *Aguilar* decision with the need to substantiate the credibility of an unnamed informant is largely directed to an inherently unreliable class of persons involved with the criminal underworld. In this case, the informant was a member of a law enforcement agency, who came across his information in the course of his official duty, with no personal interest in obtaining a false warrant. In such a double hearsay situation, an officer-informant relaying the information to the affiant will be considered a reliable source for the information needed

to determine probable cause. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *United States v. Fiorella*, 2d Cir., 468 F.2d 688 (1972), cert. den. 417 U.S. 917, 94 S.Ct. 2622, 41 L.Ed.2d 222 (1974), reh. den. 419 U.S. 885, 95 S.Ct. 156, 42 L.Ed.2d 128 (1974). See also *United States v. Morin*, D.Conn., 250 F.Supp. 507, 509 (1966). We agree with the Trial Judge that any fair reading of the affidavit carries the necessary implication that police in Delaware supplied the information.

 Turning now to defendants' second argument, we must decide whether the issuing magistrate could reasonably have found that the evidence in the affidavit provided a reasonable ground for belief that the articles sought by the police as evidence could be found at Johnson's residence. A warrant will not be overturned if this probable cause appears. *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). Probable cause is established when a nexus between the items to be sought and the place to be searched appears. *United States v. Maestas*, 5th Cir., 546 F.2d 1177, 1180 (1977); *United States v. Rahn*, 511 F.2d 290, 293 (1975), cert. den. 423 U.S. 825, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975).

Among the facts alleged in the affidavit as giving probable cause to search the residence were that in the vicinity of the crime, two and a half hours before it took place, witnesses conversed with three men fitting the description of the suspects and that one witness received a piece of paper containing a phone number and two first names from a man meeting the description of one of the suspects. The men were in a car of a similar description to one seen parked in front of the store one hour prior to the holdup. The phone number was checked to reveal that it was the home of Wilbur Johnson, and the witness who had received the slip of paper identified Johnson from a photograph as the man seen near the holdup. The affidavit also indicated that a gun was used in the holdup and that clothing was discarded and other clothing received by the perpetrators near the scene.

 Concrete firsthand evidence that the items sought are in the place to be searched is not always required in a search warrant. *United States v. Maestas, supra*, 546 F.2d at 1180. The question is whether one would normally expect to find those items at that place. *Id.*, 546 F.2d at 1180; *United States v. Lucarz*, 9th Cir., 430 F.2d 1051 (1970); *Vessels v. Estelle*, S.D.Tex., 376 F.Supp. 1303 (1973), aff'd without opinion, 494 F.2d 1295 (1974); *State v. Iverson*, N.D.Supr., 187 N.W.2d 1 (1971), cert. den. 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). If so, then that inference will suffice to allow the valid issuance of a search warrant for that place. *Mills v. State*, Md. App., 278 Md. 262, 363 A.2d 491 (1976). We think it clear that Johnson's residence would be a logical place to search for the weapon and clothing used in the crime. Therefore the warrant is not vulnerable to attack on the defendants' second ground.

## H

Appellants' eighth contention is that the Trial Court erred in denying their motion for a mistrial as a result of the highly prejudicial remarks of the prosecutor during final summation to the jury, not all of which were objected to by defense counsel at trial.

 In this State, there is some tradition that objections to closing argument are restricted. But this tradition cannot properly rest on restraint in the face of error. Rather, restraint is appropriate when counsel is using his privileged latitude to discuss the evidence, the reasonable inferences therefrom, and the appropriate law and its application to the evidence. It is inappropriate when counsel goes beyond those limitations. See 3 *Wharton's Criminal Procedure* § 523 (12th ed. 1975). Timely objections can be vital to appropriate corrective action and their necessity has been recognized by our law. *State v. Von Buren*, Del.Gen.Sess., 7 Boyce 79, 102 A. 981, 982 (1918). A special burden, as usual, rests on

the trial judge to control the conduct of the court's officers and the trial judge should act at times even without an objection. *Washam v. State*, Del.Supr., 235 A.2d 279, 280 (1967). Indeed, misstatements by a prosecutor can amount to plain error causing reversal on appeal even in the absence of objection at the trial level. 6 Orfield, *Criminal Procedure under the Federal Rules*, § 52.60 (1967). If there is a growing tendency toward carelessness on the part of counsel, whether caused by inexperience, excessive zeal or otherwise, it should be discouraged and not condoned by inaction. See *Donnelly v. DeChristoforo*, 416 U.S. 637, 648, n.23, 94 S.Ct. 1868, 1873, 40 L.Ed. 431, 439 (1974).

Turning generally to the contentions of the appellants in this case, we will consider them all, notwithstanding the timeliness of objections, due to the concern expressed that the Trial Court may have indicated that objections during closing arguments should be limited.

Appellants complain that the prosecutor exceeded the permissible range of his argument on several different occasions. More particularly they argue that: he characterized the defendants in his closing as "despicable" people to whom the Bible "doesn't mean anything"; he appealed to local prejudice by his reference to their having come into Delaware from another state; he warned of the possible societal consequences to the community and to one of the State's witnesses of an acquittal; he commented on his own and the jury's lack of knowledge of appellants' conversations among themselves, thus allegedly referring to their failure to testify; and he made statements on two occasions implying that he had personal knowledge of facts which had not been presented to the jury.

█ The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial. He is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from that evidence. *State v. Mayberry*, N.J.Supr., 52 N.J. 413, 245 A.2d 481 (1968), cert.den. 393 U.S. 1043, 89 S.Ct. 673, 21 L.Ed.2d 593 (1969). The prosecutor, nevertheless, must remember his unique position within the adversary system. "[I]t is fundamental that his obligation is to protect the innocent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public." ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function, § 1.1, Commentary at 44 (Approved Draft, 1971) (hereinafter ABA Standards). Over forty years ago, Justice Sutherland in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) spoke of the prosecutor's duty:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

This Court has expressed similar sentiments in *Bennett v. State*, Del.Supr., 3 Storey 36, 164 A.2d 442, 446 (1960):

"A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial."

█ These general comments extend to the propriety of the content of closing argument as well as to the other aspects of a criminal trial. Closing argument is "an as-

pect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound." *Donnelly v. DeChristoforo, supra,* 416 U.S. at 649, 94 S.Ct. at 1874, 40 L.Ed.2d at 440 (dissenting opinion of Justice Douglas). "[T]he process of constitutional line drawing in this regard is necessarily imprecise . . . ." *Id.,* 416 U.S. at 645, 94 S.Ct. at 1872, 40 L.Ed.2d at 438 (Justice Rehnquist's opinion for the Court). Indeed, it is frequently difficult to ascertain whether courts are speaking of errors so fundamentally unfair as to deny the defendant due process or whether courts are merely exercising their supervisory power to curtail prosecutorial misconduct. But, in either event, the ethics of the legal profession are in issue. Because of the fair trial issue raised, we examine the remarks made in some detail.

As to the prosecutor's statement that defendants were "more despicable than Gregory Payne [the State's witness] will ever be," and his assertion that the Bible did not mean anything to them, to the extent they brought the issue of defendants' religious beliefs before the jury, such assertions are considered improper as appealing to the jurors' passions and prejudices rather than to their reasoned responses, the proper tools for deciding a case. See, e. g., *U. S. v. Fidanzi,* 7th Cir., 411 F.2d 1361 (1969), cert. den. 396 U.S. 929, 90 S.Ct. 265, 24 L.Ed.2d 227 (1969); *Commonwealth v. Cherry,* Pa. Supr., 474 Pa. 295, 378 A.2d 800 (1977); *Commonwealth v. Gilman,* Pa.Supr., 270 Pa. 179, 368 A.2d 253 (1977); *Commonwealth v. Harvell,* Pa.Supr., 458 Pa. 406, 327 A.2d 27 (1974); *Commonwealth v. Lipscomb,* Pa. Supr., 455 Pa. 525, 317 A.2d 205 (1974); ABA Standards § 5.8(c).

 It is of course difficult to describe murder in anything but unkindly fashion and certainly a prosecutor should not be denied the opportunity to speak the harsh truth. The State raises the point that these particular comments were made following and in direct reaction to remarks made by one defense counsel in his summing up. We have reviewed the transcript of defense counsel's statement and find that his remarks were indeed provocative. He had been attacking the character and credibility of the State's main witness. The State chose, rather than to emphasize Payne in a kinder light, to take the position that the four defendants were certainly no more credible than Payne. This was a permissible strategic decision for the State. There is ample authority for the contention that the prosecution may fairly attempt to neutralize strident defense arguments in the same manner as they were made. See, e. g., *United States v. Somers,* 3d Cir., 496 F.2d 723 (1974), cert. den. 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. Antonelli Fireworks Co.,* 2d Cir., 155 F.2d 631 (1946); *United States v. De Vasto,* 2d Cir., 52 F.2d 26 (1931), cert. den. 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573 (1931); *United States v. Brisco,* D.Del., 473 F.Supp. 303 (1979). We find such proposition helpful. Nonetheless, it is not a complete refutation to defendants' complaint especially since one defense counsel was responsible for the provocation and all four defendants felt the sting of the prosecutor's response. To the extent that the comments centered on credibility, they did focus on a legitimate question. Consequently, we do not feel these remarks per se require reversal on either constitutional or policy grounds. These remarks must ultimately be judged on whether they and other comments, in the whole context of the case, prejudiced defendants' right to a fair trial.

 The next criticism of the prosecutor's argument is addressed to his describing at length the societal consequences of a verdict of not guilty. On a theory similar to that discrediting comments such as those discussed above, it has been held impermissible for a prosecutor to divert the jury's attention from the specific issue of a defendant's guilt or innocence by referring at length to the larger concerns and interests of the community at large in the prosecution, and the social consequences of the verdict. A verdict must not be inspired by considerations outside the legitimate factual parameters of the case as presented.

*Commonwealth v. Cherry, supra; Commonwealth v. Harvell, supra*; ABA Standards § 5.8(d). In the prosecutor's comments, he spoke not only of the dead victim in this case but also generally including a speculative future threat to a witness:

> "No kind of—no kind of a punishment of these people will ever bring Philip Whiteman's life back, but I submit that it certainly will—is a message, not just in Delaware, but in neighboring states, that you certainly better not come into Delaware and try to commit an armed robbery and, if you do, the gun better not be loaded.

> \* \* \* \* \* \*

> "The General Assembly is making a threat, and these men are asking you to turn it into a hollow threat. And if you do and you assume that responsibility, I submit to you that you're taking a chance with people's lives. You're taking a chance with lives of people in similar situations with Philip Whiteman. I don't know if—you know, I don't know if you know people working in liquor stores, people who work in supermarkets, people who drive cars, people who drive cabs, people who work in banks, I don't know if you know any of these people. I know you know one. You know Louis Niglio.[9]

> \* \* \* \* \* \*

> "Think about Louis Niglio."

Such remarks go beyond the facts of the case and the reasonable inferences from the facts and are calculated to appeal to the emotions. Of course, it is not improper to call the jury's attention to the public policy against crime. But the focus should be on the evidence of the crime at issue. The observations of the Third Circuit Court of Appeals in *United States v. Kravitz*, 281 F.2d 581 (1960) concerning the far-reaching language used by a United States Attorney in his closing argument are somewhat applicable here:

> "A United States attorney in a criminal case has an even greater responsibility than counsel for an individual client. For the purpose of the individual case he represents the great authority of the United States and he must exercise that responsibility with circumspection and dignity the occasion calls for. His case must rest on evidence, not epithet. If his case is a sound one his evidence is enough; if it is not sound, he should not resort to epithet to give it a false appearance of strength."

*Id.*, at 587. Again we think the issue must ultimately rest on whether the right to a fair trial was prejudiced.

■■■■■■ The appellants also contend that in commenting on the fact that the jury could not know what was said in conversations among the appellants, the prosecutor was emphasizing the fact that the appellants chose not to testify, with the object of raising an inference of guilt from their silence. In *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Supreme Court held that a defendant's exercise of his constitutional right to remain silent cannot be penalized by prosecutorial suggestions that his silence implies guilt. Accordingly, this Court has framed the inquiry into the necessity for reversal in the face of such inferences as being whether the prosecutor utilized the silence to create an inference of guilt, recognizing that not all such remarks would have a prejudicial impact on the jury's deliberations requiring reversal. *Cook v. State*, Del.Supr., 374 A.2d 264 (1977); *Shantz v. State*, Del.Supr., 344 A.2d 245 (1975). In determining whether error requiring reversal has occurred it is also proper to ask whether the defendant has actually been harmed by the State's allusion to conduct which is constitutionally protected. *United States ex rel. Macon v. Yeager*, 3rd Cir., 476 F.2d 613 (1973), cert. den. 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973). In this situation the reference to defendants' silence is indirect and its impact on defendants' constitutional rights and the trial's fairness is attenuated. Although a passing speculation about what appellants might have said to each other

---

9. Louis Niglio was a witness for the State who testified before the jury. He was in the liquor store when the robbery occurred.

could conceivably be argued to be improper prosecutorial conduct, we do not see these comments as a constitutional infraction requiring reversal. Nor do we feel there was any substantive prejudice caused by the remark.

Certain remarks give rise to appellants' assertion that the prosecutor was testifying in the summation as to his knowledge of facts beyond those known to the jury. The objection is that he thereby deprived appellants of their confrontation rights because he was not subject to cross-examination. The prosecutor, in comparing the State's witness' belief in the Bible to that of the other appellants, said: "I acknowledge that it doesn't mean anything to them." He also described what had happened at a voir dire identification procedure, at which the jury had not been present, where one of the defendants had been identified. He said:

"[I]f you had seen the identification right in front of you, if you saw Martha Childress [the witness], that's the way it is and the identification looked honest. It's honest and you know it."

Both these statements suffer from the same infirmities. The prosecutor was in effect testifying to facts of which he purported to have knowledge but which were not presented to the jury, and he could not be cross-examined on the veracity of such assertions. *People v. Wright*, N.Y.Supr.App. Div., 17 A.D.2d 151, 232 N.Y.S.2d 767 (1962), cert. den. 379 U.S. 938, 85 S.Ct. 342, 13 L.Ed.2d 348 (1964). In the second statement he was in addition personally vouching for the witness' credibility, giving it added weight from his own recommendation that her testimony may not have warranted. *Holbrook v. State*, Md.Ct.Spec. App., 6 Md.App. 265, 250 A.2d 904 (1969). This argumentative tactic is improper in that it suggests that the jury may rely on the prestige of the prosecutor's official position and his superior access to the facts in forming its opinion [*Di Carlo v. United States*, 2d Cir., 6 F.2d 364 (1925); *People v. Wright, supra*] rather than basing it on the strength of the evidence. We find the comments improper and again must ask whether, in the context of the whole trial, these

comments were of a prejudicial nature requiring reversal.

Faced with these instances of prosecutorial misconduct, which, in the context of this competitive trial situation, we do not find rise to the level of constitutional error, we must consider whether the refusal to grant a mistrial was error. In the last analysis we are deciding whether it was a valid exercise of the Trial Court's discretion in its assessment of the prejudicial impact of these statements to deny the mistrial motion. The State has urged that the meaning of certain statements should be viewed in the context of the permissible argument that the State's witness was more worthy of belief than the appellants, being made in the permissible manner of comparing him with them, rather than in isolated sentences taken apart from the meaning of the whole argument. It is also urged that the Court should realize that, while the bounds of propriety may have been overstepped, any actual prejudice was blunted by the overall length of the closing statement, the force of the other arguments and the strength of the evidence. See *United States v. Hoffman*, 7th Cir., 415 F.2d 14 (1969), cert. den. 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969). These considerations count heavily as we review the Trial Court's denial of the motion for a mistrial. *United States v. Dabney*, E.D.Pa., 393 F.Supp. 529 (1975). The trial had lasted nearly two months, the jury had been presented with a great deal of testimonial and real evidence, certainly sufficient to support the ultimate verdict. These facts detract from the argument that the comments influenced the jury verdict to the defendants' prejudice.

Even more crucial to our decision are the curative instructions given by the Trial Court upon the close of trial:

" . . . I will add one other word with respect to final summations, because counsel, having been advised by the Court not to lightly interrupt each other with objections, but rather to respond in argument, had various objections, all of counsel, and have raised them to the Court, and I have considered them. And I don't

intend to itemize those objections. Very properly they weren't raised in your presence. However, I will say to the jury that no lawyer in the course of closing argument should make any arguments calculated to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or the innocence of the accused under the controlling law or by making predictions on the consequences of the jurors' verdict either to defendants or to society or law enforcement. Now, if you recall any arguments along those lines, such as inflammatory references to the character or religion of the defendants or those that I have just suggested, you should not be diverted from your true duty, which is, and I should say, as I'm sure you will perform after you hear the instructions, which is to carefully and conscientiously determine what the facts are, to apply the law to the facts, and, thus, to reach your verdict—verdicts based on the evidence in the case and on no other consideration."

While the Court took pains not to impress the special instances of misconduct on the jury's mind by mentioning them specifically, the impact of the Court's instruction could not be misunderstood. This lengthy admonishment was in our view adequate to dissipate the prejudicial impact the State's distracting and inflammatory arguments may have had. See, e. g., *United States v. Homer*, 3rd Cir., 545 F.2d 864 (1976), cert. den. 431 U.S. 954, 97 S.Ct. 2673, 53 L.Ed.2d 270 (1977); *United States v. Antonelli Fireworks Co., supra*, 155 F.2d 631; *United States v. De Vasto, supra*, 52 F.2d 26; *United States v. Dabney, supra*, 393 F.Supp. 529; *Crawford v. State*, Del.Supr., 245 A.2d 791 (1968); *Commonwealth v. MacDonald*, (No. 1), Mass.Supr., 368 Mass. 395, 333 N.E.2d 189 (1975). The impact was clearly to direct the jury to its duty.

Despite our finding that there was no reversible error, given the full context of the case, we have dwelt upon these contentions at length because we have viewed the argument as significant and because we hope for improved standards of trial conduct.

The judgment of the Superior Court, resulting in conviction of the various offenses, is affirmed over the appellants' challenges considered herein.[10]

10. As noted in the opinion, the death penalty was imposed by the Superior Court on the convictions of murder in the first degree. In accordance with the decision in *State v. Spence, supra*, resentencing will be necessary on such convictions.