**UNITED STATES of America ex rel. Seifullah ABUBAKE, et al., Petitioners,**

v.

**Supt. Walter REDMAN, et al., Respondents.**

**Civ. A. Nos. 80–294, 80–351 and 80–440.**

United States District Court, D. Delaware.

Sept. 9, 1981.

Melvyn I. Monzack, Walsh, Monzack & Owens, P.A., Wilmington, Del., for petitioners Seifullah Abubake and Sheikl Abdel Rahim Ahmad.

Peter J. Shanley, Murdoch & Walsh, P.A., Wilmington, Del., for petitioner Sterling Hobbs.

Kathleen Molyneux, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for respondents.

OPINION

MURRAY M. SCHWARTZ, District Judge.

In this consolidated action, three prisoners of the State of Delaware have filed petitions for writs of habeas corpus. Sheikl Abdel Rahim Ahmad (formerly known as Clarence Hooks), Seifullah Abubake (formerly known as Robert Golson), Sterling Hobbs, and a fourth defendant not before this Court, were convicted in 1976 in the Superior Court of the State of Delaware of first degree murder (felony murder), first degree robbery, and conspiracy in the second degree.[1] Petitioners' convictions arose out of their alleged participation in the robbery of a Claymont, Delaware, liquor store on May 5, 1975, during which a store clerk was shot and killed. All four defendants were originally sentenced to death on the felony murder charges, but their sentences were reduced to life imprisonment without benefit of parole after the Delaware Supreme Court ruled unconstitutional the then applicable Delaware death penalty statute. *See State v. Spence*, 367 A.2d 983 (Del.1976). The Delaware Supreme Court wrote a lengthy opinion affirming petitioners' convictions. *Hooks v. State*, 416 A.2d 189 (Del.1980). Petitioners now renew many of those same claims here. To avoid confusion when referring to the state court record and trial transcript, this Opinion will refer to Ahmad as Clarence Hooks and to Abubake as Robert Golson.

I.

■ An examination of the state court record reveals that the following claims are not cognizable in a federal habeas corpus proceeding and therefore may be summarily dismissed: (1) An accomplice cannot be found guilty of first degree murder under the Delaware felony murder statute for an

---

1. Hobbs was also convicted of possession of a deadly weapon during the commission of a felony.

act committed by another person (raised by Hooks and Golson); (2) the trial court erred in refusing to compel the prosecution to produce prior statements of one of the state's witnesses in its possession (Hooks and Golson); (3) the trial court erred in permitting introduction of evidence of certain prior bad acts of the defendants (Golson, Hooks and Hobbs); and, (4) the trial court erred in denying the severance motions of Hooks and Hobbs. These claims must be dismissed for two reasons: First, petitioners never urged in the state courts that these alleged trial errors rose to a violation of any federal constitutional or statutory rights, and they have therefore failed to satisfy the exhaustion requirement. *See Paullet v. Howard*, 634 F.2d 117, 119–20 (3d Cir. 1980). Second, petitioners in any event have failed in these proceedings to identify any particular federal rights abridged by these alleged trial errors, and have therefore failed to state a claim upon which relief may be granted.

## II.

Petitioners raise several claims attacking the jury selection process. First, they argue that they were denied their sixth amendment right to a jury drawn impartially from a cross-section of the community when the trial court granted the prosecution's challenges for cause to prospective jurors who stated that their conscientious scruples against capital punishment would prevent them from returning a guilty verdict even if they were satisfied by the evidence that a defendant was guilty. In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that it violates a defendant's sixth and fourteenth amendment right to an impartial jury to execute a death sentence imposed or recommended by a jury from which prospective jurors were excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777 (footnote omitted). The Court, however, held invalid only Witherspoon's sentence of death—not his convic-

tion—and expressly declined to conclude either on the evidence in the record or as a matter of judicial notice "that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction." *Id.* at 518, 88 S.Ct. at 1775. The Court emphasized that its decision would not render invalid the conviction or death sentence in any case in which veniremen were excluded for cause from the jury because their attitude toward capital punishment would prevent them from making an impartial determination of the defendant's guilt. *Id.* at 522–23 n.21, 88 S.Ct. at 1777 n.21.

Petitioners would now have this Court go beyond *Witherspoon* and hold that a "death qualified" jury is necessarily biased with respect to a defendant's guilt and therefore is not an impartial jury as required by the sixth and fourteenth amendments. Finding no legal authority or factual support in the record for such a ruling, I reject petitioners' claim. The Delaware trial court dismissed for cause only those jurors who stated that their opposition to the death penalty would prevent them from entering a guilty verdict even if convinced by the evidence and the law that a defendant had been proven guilty beyond a reasonable doubt. In *Witherspoon*, on the other hand, jurors with any conscientious scruples against the death penalty were dismissed for cause, without regard to their ability to decide the case solely on the evidence and the law. Thus, even though a narrower group of jurors was excluded in this case than in *Witherspoon*, petitioners would have this Court find their convictions invalid when the Court in *Witherspoon* would not. Such a claim is untenable. First, the Supreme Court recently declined to extend *Witherspoon* and indicated that the right to a jury selected from a cross-section of the community does not include "the right to be tried by jurors who have explicitly indicated an inability to follow the law and instructions of the trial judge." *Lockett v. Ohio*, 438 U.S. 586, 596–97, 98 S.Ct. 2954, 2960–61, 57 L.Ed.2d 973 (1978). And, more recently,

the Supreme Court has stated that the prosecution in a capital case may insist "that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court." *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). In this case the trial court, consistent with *Witherspoon, Lockett*, and *Adams*, excluded only these jurors who expressly stated that they would not return a guilty verdict that was warranted by the evidence and the law. Second, at no stage in the state or federal proceedings did petitioners seek to present evidence in support of the claim that a "death qualified" jury is not impartial on the question of guilt. Instead, they point to results of scientific studies conducted since the *Witherspoon* decision. This Court, however, is confident that it is inappropriate to determine such a complex factual question as a matter of judicial notice.[2] To pursue their claim, the proper course for petitioners to have followed would have been to present evidence in support of their claim to the Delaware courts.

██ · Petitioners also make a novel challenge to the jury selection process based upon the Delaware Supreme Court's subsequent declaration that the death penalty was unconstitutional. They point out that jurors with unwavering conscientious scruples against the death penalty were excused for cause only because the then required penalty for first degree murder was death. The death penalty statute was thereafter declared unconstitutional. Thus, by operation of an unconstitutional statute, certain jurors were excused for cause who could not otherwise have been successfully challenged. Petitioners argue that this exclusion of jurors violated their right to trial by an impartial jury. It is conceded, however, that this particular argument was never made to the Delaware courts. Consideration of this claim is therefore precluded by 28 U.S.C. § 2254(b) which provides that a

writ of habeas corpus "shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State...." *See Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). Moreover, petitioners' argument that the Court nonetheless reach the merits of the claim must be rejected in view of the strict adherence to the exhaustion requirement mandated in this circuit. *See United States ex rel. Trantino v. Hatrack*, 563 F.2d 86, 95–98 (1977); *Zicarelli v. Gray*, 543 F.2d 466, 470–75 (3d Cir. 1976) (en banc).

### III.

██ Petitioners next argue that the trial court, in conducting voir dire, showed insufficient concern for possible racial and religious prejudices among prospective jurors. In order to ensure that a defendant is tried before an impartial jury, the sixth and fourteenth amendments require that the court inquire into possible prejudices when there are substantial indications that racial or ethnic prejudices might affect the jurors in a particular case. *See Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976); *Ham v. South Carolina*, 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). In this case each of the jurors was asked if he or she had any bias or prejudice against Blacks or against Black Muslims. Assuming that this was a case where special circumstances required voir dire examination regarding racial or religious prejudices, the questions posed satisfied the minimum constitutional requirements. As the Court noted in *Ham v. South Carolina, supra*, the constitution does not require the trial judge to question jurors about racial prejudices "in any particular form, or to ask any particular number of questions on the subject, simply because requested to do so by petitioner." 409 U.S. at 527, 93 S.Ct. at 850. Whether more detailed voir dire regarding

---

2. *Cf. Witherspoon, supra*, 391 U.S. at 520 n.18, 88 S.Ct. at 1776 n.18 (leaving open possibility that defendant in a future case might seek to establish that death-qualified jury was not impartial with respect to guilt); *Grigsby v. Ma-*

*bry*, 483 F.Supp. 1372, 1389 (E.D.Ark.) ("abuse of discretion" for state court to deny defendant continuance in order to gather evidence to support claim that death-qualified jury was guilt prone), *modified*, 637 F.2d 525 (8th Cir. 1980).

prejudice would have been appropriate under Delaware law was a matter for determination by the Delaware courts. *Cf. Martin v. Warden, Huntingdon State Correctional Institution*, 653 F.2d 799, 807–08 (3d Cir. 1981).

## IV.

Hobbs claims that the trial court prevented him from freely choosing whether to exercise the constitutional right to self-representation recognized in *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The self-representation issue arose on the second day of voir dire when Hobbs and Johnson, another co-defendant not now before this Court, both asked to be appointed co-counsel status with their court appointed attorneys. Hobbs and Johnson sought to become co-counsel not because they were displeased with the representation being furnished by their attorneys, but because their ability to assist in the preparation of their defenses had been hampered by the action of officials at Smyrna Correctional Center in placing them in "24-hour lock," apparently only to protect them from other prisoners. Hobbs personally and forcefully explained his predicament to the trial court (Tr. A 299–300):

> So I'm pleased with Mr. Sawyer's representation. But I don't feel as though I'm being able to assist him adequately. I'm not able to get to the library. I'm not able to get out of my cell. I'm locked up 24 hours a day inside the cell, including being fed in the cell, the entire time. Whenever I leave the cell, I have to be handcuffed because I'm on notorious B block where people who attack guards and attempt to escape and those types of things are placed. I'm just lumped in with the rest of the people there. Consequently, I'm unable to do anything to help Mr. Sawyer in his defense and I don't think that in this type of case where people's lives are on the line and where we want to get the best type of defense as possible, I don't think that this is being

afforded in the type of situation at Smyrna Correctional Center.

> So I want to defend myself, if I must defend myself. I mean, if by defending myself, then I will be permitted to have more access to do the type of things that have to be done in assisting the defense, then I say yes, I would like to defend myself.

The trial court made several rulings with respect to the problems raised by Hobbs and Johnson. First, that court denied the requests that Hobbs and Johnson be appointed to co-counsel status and ruled that they would either have to defend themselves or continue being represented by appointed counsel.[3] The court also indicated that if the defendants elected to represent themselves, such a decision would not necessarily entitle them to any greater privileges at the Correctional Center. Tr. A 298, 300. The court did, however, indicate that it would consider holding a hearing at which it would receive evidence and consider its legal authority to require changes in the conditions of defendants' confinement to the extent that such matters interfered with the trial. Tr. A 302. Neither Hobbs nor Johnson, under these circumstances, expressed any further interest in self-representation. The court did hold a hearing nine days later, while jury selection was still in progress, and at that time granted Johnson and Hobbs relief to the extent of ordering them removed from maximum security confinement. Tr. E 184–86.

The sixth and fourteenth amendments guarantee a criminal defendant a right to conduct his own defense which exists apart from the right to have the assistance of counsel. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819–20, 95 S.Ct. at 2533. If a defendant has a constitutional right to defend himself, it follows that an incarcerated

---

**3.** Tr. A 296, 298. The court did, however, indicate that if Hobbs and Johnson elected to represent themselves counsel would be available to serve them in an advisory capacity. Tr. A 290–91.

defendant must also have such access to legal materials and the freedom to communicate with witnesses and other persons as is reasonable under the circumstances so as to make his self-representation as effective as possible. Some courts have thus indicated that denying a *pro se* defendant access to legal materials or otherwise unreasonably hindering the preparation of his defense may violate the defendant's rights to due process, self-representation and a fair trial. *See United States v. Trapnell,* 638 F.2d 1016, 1029 (7th Cir. 1980); *United States v. Bynum,* 566 F.2d 914, 918 (5th Cir.), *cert. denied,* 439 U.S. 840, 99 S.Ct. 129, 58 L.Ed.2d 138 (1978); *cf. Haslam v. United States,* 431 F.2d 362, 364–65 (9th Cir. 1970) (no infringement of right to self-representation when, three weeks after trial, court revoked library and telephone rights of *pro se* defendant who had abused such privileges), *adhered to on rehearing,* 437 F.2d 955 (9th Cir.), *cert. denied,* 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). *See generally* Note, *The Jailed Pro Se Defendant and the Right to Prepare a Defense,* 86 Yale L.J. 292 (1976).

■ This case, however, does not require the Court to decide the extent to which the state courts and prison officials must accommodate a *pro se* defendant to enable him to prepare his defense. The record makes clear that Hobbs did not want to represent himself, but instead sought greater privileges at the correctional center so as to better enable him to assist his attorney before and during trial. Thus, although it might impinge on the right to self-representation for a court to tell a defendant who truly desires to present his own defense that he will not have access to legal materials or the means to communicate with witnesses or other persons, such was not the case here. Hobbs stated that he wanted to proceed *pro se* "if representing myself would thereby empower this Court to give me more freedom on the Smyrna compound, not any more freedom than the next prisoner but just the adequate amount of

freedom that any prisoner that has not been charged with any crime inside the institution receives...." Tr. A 298. Hobbs evidently received precisely the relief he sought when the trial court ordered him removed from maximum security detention, and he has not suggested that the remedy granted was inadequate, or identified any way in which the preparation of his defense was prejudiced. Therefore, the Court must conclude that his constitutional rights were not violated.

## V.

Petitioners contend that certain statements during the rebuttal portion of the prosecution's closing argument denied them a fair trial.

■ One of the most troubling statements was a reference by the prosecutor to identifications of two of the defendants that had been made during the course of voir dire examination out of the presence of the jury. In referring to the identifications of Wilbur Johnson by Martha Childress and of Sterling Hobbs by Brian Scanlan, the prosecutor stated (Tr. Y 153–54):

> I wish that these identifications had occurred in your presence. Very properly the defense attorneys asked for a voir dire on all these identifications so you didn't get the full emotional impact of them. You got Brian Scanlan sitting there and saying, yes, a couple of minutes ago I identified this man. But if you had seen the identification right in front of you, if you saw Martha Childress, that's the way it is and the identification looked honest. It's honest, and you know it.

Although Scanlan did identify Hobbs in front of the jury, these statements constituted a specific reference to facts not brought before the jury and were therefore improper. *See, e. g., United States v. Rios,* 611 F.2d 1335, 1342–43 (10th Cir. 1979); *United States v. Garza,* 608 F.2d 659, 663–64 (5th Cir. 1979); *United States v. Somers,* 496 F.2d 723, 740 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).[4]

4. The ABA takes the position that "[i]t is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or an appeal...." ABA Project on Standards for Criminal Justice: The Prosecution Function § 5.9 (Approved Draft, 1971).

The comments were also improper because, in referring to the voir dire identification, the prosecutor sought to vouch for and bolster the credibility of its witnesses. *See, e. g., United States v. Roberts,* 618 F.2d 530, 533–34 (9th Cir. 1980); *United States v. Swinehart,* 617 F.2d 336, 338–40 (3d Cir. 1980) (per curiam); *United States v. Lefevre,* 483 F.2d 477, 478–79 (3d Cir. 1973); ABA Code of Professional Responsibility, Disciplinary Rule 7–106(C)(4). This Court, however, does not sit in a supervisory function over the Delaware courts. In exercising its habeas corpus jurisdiction the Court can act only to remedy violations of rights secured by the constitution or other laws of the United States. Therefore, before granting a writ of habeas corpus on the basis of misconduct during closing argument, the "prosecutorial argument must be so egregious so as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher,* 602 F.2d 117, 119 (6th Cir.), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979); *see Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974). In view of the length of the trial, and the strength of the evidence against Hobbs, this Court cannot conclude that the prosecutor's efforts to bolster the credibility of the identification of Hobbs was so grossly prejudicial as to deny him a fair trial.

■ Petitioners also point to a number of alleged inflammatory and prejudicial remarks designed to appeal to the emotions of the jurors. The prosecutor's remarks included a statement that the defendants were "far more despicable" than Gregory Payne, a co-defendant turned prosecution witness (Tr. Y 179); a statement to the effect that the Bible "doesn't mean anything" to the defendants (Tr. Y 177–78); and argument that a conviction was necessary to protect Delaware citizens engaged in occupations especially vulnerable to robbery. (Tr. Y 183–84). Such comments, unrelated to the evidence in the case and the questions before the jury, were clearly improper. Again, however, when considered against the backdrop of a six-week trial and the strength of the evidence against the defendants, it cannot be said that these comments were so egregious as to deny defendants the fair trial guaranteed them by the due process clause of the fourteenth amendment.

■ The final challenge to the prosecutor's closing argument is the assertion that certain statements constituted an impermissible comment on the failure of defendants Hooks and Golson to testify. In *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the Court held that it violates a defendant's constitutional privilege against self-incrimination for either the prosecution or the trial court to comment upon a defendant's failure to testify. A prosecutor's comments are improper under *Griffin* if " 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *United States v. Chaney,* 446 F.2d 571, 576 (3d Cir.), *cert. denied,* 404 U.S. 993, 92 S.Ct. 543, 30 L.Ed.2d 546 (1971). Nowhere in the record is there any direct reference by the prosecution to the failure of any of the defendants to testify. Rather, Hooks and Golson point to the following as indirect references to their silence at trial:

Wilbur Johnson, Sterling Hobbs and Robert Golson, we don't know what they talked about when they looked at that liquor store. We don't know whether they talked about anything in connection with any of the clerks in that liquor store. If we knew, it might make your hair stand on end. We don't know. But, ordinarily, when you case a place, you don't just go to it and look at it. You talk about your prey. You confer about it. You heard some pretty nasty things said about Gregory Payne, and you really haven't heard the many, many nasty,

filthy things said by the other men because Gregory Payne is the one that bared his soul. (Tr. Y 168–69).

I said earlier there's lots you don't know about the participation of Robert Golson and some of these other people. You don't know, for example, exactly how Robert Golson knew to drive to the church in Eddystone. What conversation did he have with people? What did they talk about? Would it be as horrible to hear as what Gregory Payne said about his participation? I'm sure it would be. (Tr. Y 175).

I submit to you that even if you go through that routine the defense attorneys want you to of putting Gregory Payne on the scale and saying to yourselves, oh, my God, he got off with twenty years, how can my verdict lead to the hanging of these other people? I think, even if you do that, you will examine what these other people have done, you will examine the kinds of witnesses they have called or the kinds of choices they have made along the line, as Robert Golson will, and I think you will find out that if you really knew what was said in some of these—some of these times when Gregory Payne wasn't there, that these people are far more despicable than Gregory Payne will ever be. (Tr. Y 178–79).

Viewed in the context of the summations made by defense counsel, wherein the character and credibility of Payne, the lead prosecution witness, were vigorously attacked, it appears that these comments were specifically intended to rebut the attacks on Payne and to rehabilitate him in the minds of the jury. Thus, the gist of the argument was that the defendants were bad people and that the jury should not disbelieve Payne simply because he too was a bad person. Although there was speculation as to evidence not presented to the jury about the defendants' bad character, it can-

not be said that the jury necessarily interpreted these statements as comment on the fact that Golson and Hooks had not testified. Particularly, these comments cannot be fairly read as intended to ask the jury to draw an inference of guilt from the speculation about the missing evidence of defendants' bad character. Viewing the prosecutor's statement in their context, and taking note of the trial court's instruction that the jury not draw any adverse inference from a defendant's failure to testify (Tr. Y 222–23), the Court concludes that the defendants' *Griffin* rights were not violated.

### VI.

Clarence Hooks argues that the trial court erred in permitting the introduction into evidence of certain incriminating statements obtained in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[5] Hooks concedes that he was given the warnings required by *Miranda*, but argues that the statements were made without being preceded by a knowing and intelligent waiver of his right to counsel and his privilege against self-incrimination. The trial court and the Delaware Supreme Court concluded that there had been no *Miranda* violation since the record established that Hooks understood his rights and made his statements voluntarily. *See* 416 A.2d at 199–200; Tr. R 40–42.

*Facts*

James Corrigan, a Delaware State Police detective, questioned Hooks on May 12, 1975, in a jail cell in Tinicum Township, Pennsylvania, shortly after Hooks' arrest on a fugitive warrant. Corrigan's testimony at the suppression hearing established the following facts. Corrigan told Hooks that there was a Delaware arrest warrant charging him with first degree murder and then advised him of his *Miranda* rights. While Corrigan was advising Hooks of his *Miran-*

---

**5.** Although Golson also raises this same claim in his habeas corpus petition, it is clear that he does not have standing to assert a violation of Hooks' *Miranda* rights. *See, e. g., United States v. Pruitt*, 464 F.2d 494, 495 (9th Cir. 1972); *United States v. Sanchez*, 449 F.2d 204, 205 (5th Cir. 1971), *cert. denied*, 405 U.S. 925, 92 S.Ct. 973, 30 L.Ed.2d 798 (1972). *See also Couch v. United States*, 409 U.S. 322, 328, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973) ("the Fifth Amendment privilege is a *personal* privilege . . .") (emphasis in original).

da rights, Hooks "continuously kept saying as-salaam-alaikum." Tr. P 155. When Corrigan asked Hooks whether he understood each right, Hooks each time gave the same response—as-salaam-alaikum. Corrigan then told Hooks that "I didn't understand him but that I was going to advise him what had happened in Delaware and that we were there for one reason, that we knew he was involved." Tr. P 156.

At this point, with "as-salaam-alaikum" having been Hooks' only response to Corrigan's questions, other than to say "no" to Corrigan's inquiry as to whether Hooks knew why he was in jail, Corrigan told Hooks that he was involved in the investigation of a robbery-homicide which had taken place on May 5, 1975. Corrigan informed Hooks that certain facts had been developed as a result of the investigation and that some arrests had been made. Tr. P 167. Again, Hooks' only response was to utter "as-salaam-alaikum." According to his own testimony, Corrigan then said: "I'm going to tell you what happened just to let you know that I know something about what is going on anyway, so you're not going to be telling me anything new, and then at this time I started relaying to him information that we had gathered through the investigation...." Tr. P 168. Corrigan then told Hooks that police officials knew that, at the time of the robbery, Hooks was in a blue car in the parking lot of the Cumberland Dairy, that his car overheated, and that four other individuals went into the liquor store. Corrigan's description of what was presumably known about Hooks' involvement in the robbery-murder evidently had an effect upon Hooks. Corrigan testified (Tr. P 168):

> And by advising him, I could tell he knew at this time that I knew something more than what he gave me credit for when I first walked into the cell. So, I started again. I said, 'Now, Clarence, is it correct that you have a blue car?' And he said, 'I got a blue car.'

This admission that he had a blue car was Hooks' first response to Corrigan's questioning other than "as-salaam-alaikum." In response to further questioning, Hooks then made a series of incriminating statements, including admitting that he was in his blue car in the Cumberland Dairy parking lot at the time of the murder, and that he knew Bobby Golson. Hooks denied that there were four individuals with him who went into Ridge Liquors, and stated: "You can't put me in that liquor store." Tr. P 169. The entire interview lasted no more than one-half hour. Tr. P 161. No evidence was adduced to indicate that Corrigan at any point asked Hooks if he wished to waive his *Miranda* rights. At the suppression hearing Hooks testified that he understood the questions posed to him by Corrigan and that he knew he did not have to say anything. Tr. Q 67–71. When asked by the trial judge why he kept repeating the phrase "as-salaam-alaikum," Hooks responded "Because I didn't want to say something I didn't know anything about." Tr. Q 81.

*Analysis*

In *Miranda* the Supreme Court outlined the proof necessary to establish a waiver of a suspect's rights during custodial interrogation. When a defendant makes a statement without the presence of an attorney "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475, 86 S.Ct. at 1628. The Court stated that "[a]n express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver," but emphasized that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Id.* Finally, the court observed that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Id.* 384 U.S. at 476, 86 S.Ct. at 1629.

More recently the Court has had the opportunity to analyze the requirements of a valid waiver in specific factual situations. In *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the Court rejected the claim that statements made during the course of custodial interrogation are inadmissible unless the defendant explicitly waived the right to the presence of an attorney at the time the statement was made. Instead, the Court adopted an approach which requires analysis of the facts of each case to determine whether a valid waiver was made:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

441 U.S. at 373, 99 S.Ct. at 1757 (footnote omitted).

■ Some courts have interpreted this waiver standard to mean that the government may meet its burden in overcoming the presumption against waiver with proof that the defendant acknowledged that he understood his *Miranda* rights and thereafter willingly answered questions. *See, e. g., United States v. Velasquez*, 626 F.2d 314, 320 (3d Cir. 1980); *United States v. Payton*, 615 F.2d 922, 924 (1st Cir.), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2950, 64 L.Ed.2d 830 (1980); *United States v. Stark*, 609 F.2d 271, 273 (6th Cir. 1979); *see* Note, 60 B.U.L. Rev. 738, 749 (1980). It is clear, however,

that a defendant's acknowledgment of an understanding of his *Miranda* rights and a subsequent voluntarily made statement will not *always* constitute a valid waiver. Rather, the courts must inquire into the "totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197 (1979).

This term, in *Edwards v. Arizona*, —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court further developed the waiver doctrine. Edwards was arrested on robbery, murder, and burglary charges and taken to a police station where he stated that he understood his rights and was willing to answer questions. After a period of interrogation Edwards requested an attorney, at which time questioning ceased and Edwards was taken to the county jail. The next morning two detectives went to see Edwards. When Edwards said that he did not wish to speak with anyone, a guard told him "he had" to talk and brought him to the detectives. Edwards was given *Miranda* warnings and then stated that he was willing to talk. After listening at his own request to the taped statement of an alleged accomplice, Edwards implicated himself in the crime. 101 S.Ct. at 1882.

The Supreme Court rejected the holding of the Arizona Supreme Court that Edwards had waived his rights to silence and to counsel when he voluntarily gave his statement to the detectives at the second interrogation session after having been again informed that he need not answer questions and that he had the right to counsel. Rather, the Supreme Court determined that the Arizona Supreme Court had not followed the rule that "waivers of counsel must not only be voluntary, but constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' " *Id.* at 1883–84 *quoting Johnson v.*

*Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The Arizona Supreme Court erred because it considered only the question of whether Edwards' statement had been voluntary, "without separately focusing on whether Edwards had knowingly and intentionally relinquished his right to counsel." *Id.* 101 S.Ct. at 1884. Finding Edwards' invocation of his right to counsel during the first questioning session especially significant, the Supreme Court held "that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* The Court further held that when a suspect expresses a "desire to deal with the police only through counsel, he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Id.* at 1885.

*Edwards* establishes that there are certain circumstances in which a suspect who has been given the required warnings and who understands his rights [6] cannot make a knowing and intelligent waiver of those rights simply by thereafter making a voluntary statement. Rather, whether a suspect understood his rights, whether he made a statement voluntarily, and whether he made a knowing and intelligent waiver of his rights are distinct issues. The question this Court must decide is whether the Delaware courts erred by focusing solely on Hooks' comprehension of his rights and the voluntary nature of his statements without making a discrete inquiry to determine whether Hooks also made a knowing and intelligent waiver of his rights to silence and to the presence of counsel.

There can be no dispute but that Hooks, prior to the time that he made the incriminating statements, did not manifest any intent to waive his *Miranda* rights. Detective Corrigan never obtained an acknowledgment from Hooks that he understood his rights or any express indication that Hooks desired to waive his rights and make a statement. Indeed, Corrigan himself indicated that he did not know how to interpret Hooks' words and conduct—especially the repeated exclamation as-salaam-alaikum—when he stated in his testimony that, "I kept asking him if he understood each right, and he kept coming back with as-salaam-alaikum. At this time I told him that I didn't understand him but that I was going to advise him what had happened in Delaware and that we were there for one reason, that we knew he was involved." Tr. P 155–56. Of course, neither did Hooks expressly communicate to Corrigan a desire to invoke his rights to silence and to the presence of counsel. In responding to questions only with as-salaam-alaikum, Hooks apparently was either "keeping his options open" about talking to Corrigan, or perhaps awkwardly and indirectly saying that he did not wish to make a statement. Whatever Hooks did mean, there can be no doubt that by saying as-salaam-alaikum Hooks did *not* mean "I wish to waive my rights to silence and the presence of counsel." If Hooks did waive his *Miranda* rights, this waiver occurred by implication, as the Delaware courts apparently held, when Hooks first responded to one of Corrigan's questions by admitting that he did own a blue car.

It is clear, however, that Hooks was subjected to a significant period of interrogation prior to the purported implied waiver.[7] In this case, at a point when Hooks had not acknowledged that he understood his rights and had neither expressly or implicitly

**6.** Edwards had expressly acknowledged during the first interrogation session that he understood his rights. *See* 101 S.Ct. at 1881.

**7.** The Supreme Court has defined interrogation under *Miranda* as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) (footnotes omitted).

waived those rights, Corrigan employed the interrogation technique of positing Hooks' guilt.[8] As Corrigan put it to Hooks, "I'm going to tell you what happened just to let you know that I know something about what is going on anyway, so you're not going to be telling me anything new...." Tr. P 168. Corrigan then proceeded to describe what he said the police knew to have been Hooks' presence and participation in the liquor store robbery.

The interrogation technique utilized by Corrigan in this case was discussed at length by the Court in *Miranda*. There the Court surveyed psychological ploys used during custodial interrogation, and turned to police manuals for an elaboration of some of the techniques used to obtain confessions: "To highlight the isolation and unfamiliar surroundings, the manuals instruct the police to display an air of confidence in the suspect's guilt and from outward appearances to maintain only an interest in confirming certain details. The guilt of the subject is to be posited as a fact." 384 U.S. at 450, 86 S.Ct. at 1615. This and other interrogation techniques "are designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty. Explanations to the contrary are dismissed and discouraged." *Id.* The Court summed up the nature of prevalent custodial interrogation techniques:

> To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort

to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

384 U.S. at 455, 86 S.Ct. at 1617 (footnote omitted).

■ Although it is a close and difficult question, the fact that Hooks' purported implied waiver was preceded by a course of interrogation which the investigating officer should have known was likely to encourage incriminating responses and to diminish in Hooks' mind the importance of exercising his rights persuades me that the state failed to meet its "heavy burden" of establishing a knowing and intelligent waiver. The premise of this conclusion is my view that *Miranda* does not permit officers of the state to take affirmative steps to trivialize in a suspect's mind the importance of exercising his rights to silence and the assistance of counsel. That trivialization occurred in this case when Corrigan went to substantial lengths to persuade Hooks that if he responded to his questions he would be "merely confirming" that which the police already knew. Moreover, the groundwork laid by Corrigan clearly seems to have had the effect of putting Hooks on the defensive, as evidenced by his effort to minimize his involvement in the crime with the statement "You can't put me in that liquor store." Tr. P 169. Hooks, of course, was unlikely to have understood that the state would neither need to prove that he shot the clerk nor that he was even present in the liquor store in order to hold him liable for felony murder.

A recent case decided in the Fifth Circuit supports the conclusion that there was no valid waiver. In *United States v. McCrary*, 643 F.2d 323 (5th Cir. 1981), state police officials searched McCrary's trailer pursuant to a warrant authorizing a search for illicit drugs. Following completion of the search, Smith, the officer in charge, in-

---

8. The Court in *Innis* noted that use of psychological ploys, such as positing the guilt of the subject, minimizing the moral seriousness of the offense, and casting blame on the victim or society, were recognized in *Miranda* as techniques of persuasion that amounted to interrogation in a custodial setting. *See* 446 U.S. at 299, 100 S.Ct. at 1688–89.

formed McCrary that he was suspected of "being involved in some crimes." 643 F.2d at 328. Smith then read the *Miranda* warnings to McCrary and proceeded to question him about how and where he had obtained certain rifles and shotguns found in the trailer. McCrary then made incriminating statements which were later used against him in a federal firearms prosecution. The Fifth Circuit held that the statements should have been suppressed for the reason that McCrary could not have made a knowing and intelligent waiver of his *Miranda* rights when he had no reason to suspect that the questioning was directed toward weapons charges. *Id.* at 329. This conclusion rested upon the following analysis of *Miranda* :

> A valid waiver of constitutional rights does not occur in a vacuum. A waiver of the right to counsel and right to remain silent occurs in response to a particular set of facts involving a particular offense. The *Miranda* warnings are given not solely to make the suspect aware of the privilege, but also of the consequences of foregoing the privilege.

*Id.* at 329 (footnote omitted).

If there are circumstances in which interrogators must advise a suspect of facts essential to a comprehension of the consequences of a decision to make a statement, it is in my view elemental that interrogators must refrain from affirmative conduct calculated to diminish in the suspect's mind the anticipated consequences of a decision to forego the rights to silence and the assistance of counsel. Indeed, the Supreme Court has stated that one of the functions of the *Miranda* warnings is "to assure that the person who responds to interrogation while in custody does so with intelligent understanding of his right to remain silent and of the consequences which may flow from relinquishing it." *Johnson v. New Jersey,* 384 U.S. 719, 729–30, 86 S.Ct. 1772, 1778–79, 16 L.Ed.2d 882 (1966). This pur-

pose of the warnings would be frustrated if, once the warnings are given, an interrogator may encourage a waiver by seeking to persuade the suspect that, in Detective Corrigan's words, "You're not going to be telling me anything new . . . ."

To the extent that the determination of the Delaware courts that Hooks made a knowing and intelligent waiver of his rights was a finding of fact, I conclude such a finding "is not fairly supported by the record." 28 U.S.C. § 2254(d)(8). Since I have declined to accept the findings of the state courts, I am required to explain my reasons for so doing. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).[9] Although the record contained evidence supporting a finding that Hooks understood his rights and spoke voluntarily, I find that no evidence was adduced to establish that his decision to make incriminating statements was the result of a knowing and intelligent waiver rather than the product of the preceding interrogation which the investigating officer should have known was reasonably likely to diminish in Hooks' mind the importance of asserting his *Miranda* rights.

Hooks is not entitled to the issuance of a writ of habeas corpus, however, if it can be said that the admission of his statements to Detective Corrigan was harmless error. After considering the arguments of counsel on this matter,[10] and reviewing the record, the Court concludes that admission of Hooks' statements was harmless error.

The prosecution's lead witness was Gregory Payne, a codefendant who had agreed to testify as part of a plea bargain. Payne testified at great length about the planning and execution of the robbery and of the specific roles played by Hooks and the other defendants. Payne's testimony was corroborated in many significant details by other witnesses, a number of whom also offered

---

**9.** Although the Supreme Court's specific holding was limited to cases in which a federal district court grants a writ of habeas corpus, I am of the view that such an explanation is also appropriate when a district court does not accept the findings of the state courts, but de-

clines to grant the writ for reason of harmless error.

**10.** Pursuant to the Court's request, counsel submitted memoranda on the question of harmless error.

highly probative circumstantial evidence of Hooks' involvement in the crime. Finally, an examination of the testimony and the arguments of counsel indicate that Payne's credibility was one of the key fact questions put to the jury. The jury's verdict against Hooks' codefendants demonstrates that the jury believed Payne's testimony. In sum, taking into account these factors and the record as a whole, I am satisfied that the other evidence of Hooks' guilt was overwhelming and that the admission of his statements to Corrigan was harmless beyond a reasonable doubt. *See Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### Conclusion

An order will be entered denying the petitions for writs of habeas corpus and stating that there is no probable cause for an appeal but for the claim of petitioner Clarence Hooks predicated upon *Miranda v. Arizona, supra,* discussed in section VI of this opinion.