IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TROY DIXON, | § | |
| | § | No. 319, 2020 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID. No: 1211005646A(N) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: June 9, 2021
Decided: August 4, 2021

Before **VALIHURA, TRAYNOR**, and **MONTGOMERY-REEVES** Justices.

**O R D E R**

This 4th day of August, 2021, the Court has considered the parties' briefs, the record on appeal, and the argument of counsel, and it appears that:

1. Troy M. Dixon was convicted of numerous criminal offenses in two Superior Court trials, both of which stemmed from a 2012 shooting incident in Wilmington, Delaware. In the first trial, Dixon was convicted of assault in the second degree, possession of a firearm during the commission of a felony, and resisting arrest. In the second trial, Dixon was convicted of possession of a firearm by a person prohibited. All told, Dixon was sentenced to 26 years of imprisonment. This appeal concerns only the first of these trials.

2. On direct appeal, this Court affirmed Dixon's convictions in the first trial.[1]

3. In December 2014, Dixon filed his first motion for postconviction relief under Superior Court Criminal Rule 61. The Superior Court denied this motion,[2] and, once again, we affirmed.[3]

4. In November 2018, Dixon filed a second motion for postconviction relief in which he claimed, among other things, that newly discovered evidence had emerged that the prosecution's ballistics expert, Carl Rone, had pleaded guilty to falsifying work records. The motion did not allege that this evidence created a strong inference that Dixon was actually innocent of the acts underlying charges of which he was convicted. By an order dated June 18, 2019,[4] the Superior Court denied this second motion. Several months later, Dixon filed a notice of appeal of the Superior Court's decision in this Court; we dismissed the appeal as untimely.

5. When Dixon filed a third motion for postconviction relief, it came to light that Dixon's counsel in his second postconviction relief proceeding did not tell Dixon about the Superior Court's June 18, 2019 order, which caused Dixon's appeal to be untimely. Therefore, in the interests of justice, the Superior Court vacated the

---

[1] *Dixon v. State*, 2014 WL 4952360 (Del. Oct. 1, 2014).
[2] *State v. Dixon*, 2016 WL 5929251 (Del. Super. Ct. Oct. 11, 2016).
[3] *Dixon v.* State, 164 A.3d 919, 2017 WL 2492565 (Del. June 8, 2017) (TABLE).
[4] This order was initially entered on June 6, 2019, but, because the original order was inadvertently not sent to counsel, the decision date was later changed to June 18, 2019.

2

June 18, 2019 order and reconsidered the claims Dixon made in his second postconviction relief motion. But the result was no different; the Superior Court denied the motion, and Dixon appealed to this Court.

6. Dixon presents one argument in this appeal. He contends that, because the State's ballistics expert was convicted of crimes involving dishonesty—years after Dixon's trial—and because the expert's testimony was, according to Dixon, the "[o]nly . . . piece of evidence [that] linked Dixon to the crime,"[5] "the interests of justice and Rule 61(d)(2)(i) require Dixon be granted a new trial."[6] Under Rule 61(d)(2)(i), a second or subsequent postconviction relief motion is subject to summary dismissal "unless the movant was convicted after a trial and the motion . . . pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted."[7]

7. This Court reviews the Superior Court's denial of a motion for postconviction relief under Superior Court Criminal Rule 61 for abuse of discretion.[8] Based on our review of the record, we agree with the Superior Court that Rone's

---

[5] Opening Br. at 3. Dixon makes this patently skewed claim elsewhere. *See id*. at 4 ("The only evidence that linked Dixon to this crime was the testimony of Carl Rone . . . , the State's ballistic expert."); *id*. at 13 ("Only one piece of evidence linked Dixon to the crime: the testimony of Carl Rone."); *id*. at 17 ("No evidence presented by the State, other than the testimony of Carl Rone, linked Dixon to the crime.").

[6] *Id*. at 3.

[7] Super. Ct. Crim. R. 61(d)(2)(i).

[8] *Dawson v. State*, 673 A.2d 1186, 1190 (Del. 1996).

convictions, whether or not they are "new evidence" within the meaning of Rule 61(d)(2)(i), do not give rise to an inference—much less a strong one—that Dixon is actually innocent.

8.    On the evening of November 4, 2012, Kevin Bell was fatally shot. Earlier that night, Bell and Troy Dixon had a heated discussion with Maurice Harrigan at the Rebel nightclub.

9.    A few days later, Darren Brown drove Harrigan to Bell's funeral where they saw Dixon.  Dixon appeared to be angry.  In a police interview, Harrigan said that Dixon "was grittin' on [him],"[9] which the interviewer took to mean that Dixon was staring at Harrigan "like he had a problem with him."[10]

10.    Brown, Harrigan, and Aaron Summers left the funeral together; once again, Brown was the driver.  Harrigan was in the front passenger seat, and Summers was in the back seat.

11.    While at a stop light, Brown saw through his rearview mirror that a black Crown Victoria was approaching.  Then, according to Brown, "we started getting shot at."[11]  Brown heard five or six gunshots, and he testified that the shots "were definitely coming from the black Crown Vic,"[12] more specifically from the

---

[9] App. to Answering Br. at B12.
[10] *Id*. at B13.
[11] App. to Opening Br. at A54.
[12] *Id*. at A55.

4

passenger side. Brown described the shooter as "a light-skinned man with a beard."[13] One of the shots hit Summers in the back of his neck.

12.    Police found five nine-millimeter shell casings at the scene of the shooting and retrieved one spent projectile from the hospital where Summers was taken.

13.    As police began their search for the black Crown Victoria, one officer recalled that he had earlier "run[] a tag"[14] for a black Crown Victoria in the same general vicinity as the shooting so he included that tag number and the model year of the vehicle—2007—in the broadcast to other officers.[15]

14.    Shortly after that, a police officer spotted a 2003 black Crown Victoria in the Browntown section of Wilmington, which includes the address at which the 2007 Crown Victoria mentioned above was registered. When the driver of that vehicle saw the officer, he "looked startled,"[16] and then "abruptly stopped, reversed, and sped away at . . . a high rate of speed."[17]

---

[13] *Id.* at A57.

[14] App. to Answering Br. at B17.

[15] Dixon makes much of the fact that he was found in a 2003 Crown Victoria with "temporary tags completely different from the tags reported in the police bulletin," Opening Br. at 9, as if the year and tag number had been provided by witnesses to the shooting. He even goes so far to suggest that this discrepancy is evidence of his innocence. Given the actual source of the tag number and model year included in the bulletin, we find the discrepancy to be irrelevant.

[16] App. to Opening Br. at A117.

[17] *Id.*

5

15.     A high-speed vehicle pursuit ensued.  The driver of the Crown Victoria, Zaire Cephas, ignored police lights and sirens, and, at one point, struck the rear of a van at Maryland Avenue and West 2nd Street.  But the chase continued as Cephas steered the Crown Victoria onto Interstate 95.  Once on I-95, Cephas decelerated so that his passenger—Dixon—could jump out.

16.     Once out of the car, Dixon ran under an I-95 overpass, "clutching his midsection with his right hand as if he [was] . . . holding something."[18]  With an officer in pursuit—now on foot—Dixon threw something with his right hand.  The chase continued, and the police eventually caught Dixon.  When they returned to the site where the pursuing officer saw Dixon throw something, they found a Ruger 9-millimeter P95 semi-automatic pistol, with one shell casing stuck or "stovepiped" in it.  Later that day, when Dixon spoke with police, he admitted that he possessed the Ruger, which had been given to him "a day or two ago."[19]

17.     There were two relevant photographic lineups.  In one, Brown said that Dixon's complexion and beard were similar to the shooter's, but when, at trial, defense counsel pointed at Dixon and asked Brown if he was the shooter, Brown responded:  "Never seen him before in my life."[20]

---

[18] App. to Opening Br. at A22.
[19] November 8, 2012 Police Interview of Dixon, State's Trial Ex. 58, at 12:53.
[20] App. to Opening Br. At A92.

6

18.    In the second lineup, police showed the photographs to Harrigan. Harrigan was unable to select the shooter or the driver of the Crown Victoria from the lineup, but he did identify Dixon as one of the men he argued with at the nightclub the night that Kevin Bell was killed.[21]

19.    Carl Rone, the State's firearms expert, performed ballistics testing on the recovered Ruger, casings, and bullet and generated a report summarizing his findings. Dixon did not challenge Rone's credentials or his methodology.   At Dixon's trial, Rone testified, consistently with his report, that the shell casings recovered from the scene and one of the bullets came from the gun that Dixon threw to the ground while running from the police.

20.    According to a detective familiar with the weapon, a 95 Ruger 9-millimeter pistol's magazine typically holds 15 bullet cartridges.  We note that the math—five casings from the scene and one "stovepiped" casing plus nine unfired cartridges in the magazine when the gun was retrieved equals 15—provides further circumstantial evidence that Dixon's gun was used in the shooting.

21.    In May 2018, four and a half years after Dixon was convicted, Rone was charged with theft by false pretenses and falsifying business records after he provided false activity sheets to the Delaware State Police and received

---

[21] We agree with Dixon that these lineups do not support the Superior Court's finding that "eye witness [sic] testimony identified [Dixon] as the shooter." *State v. Dixon*, 2020 WL 5289927, at *4 (Del. Super. Ct. Sept. 4, 2020).

compensation for work that he had not performed. Rone pleaded guilty to both charges.

22. Dixon grounds his contention that, because of Rone's 2018 convictions, he is entitled to a new trial on three principal suppositions. First, as mentioned before, Dixon asserts that Rone's testimony is the only piece of evidence linking him to the shooting. Second, he argues that this Court's decision in *Fowler v. State*[22] dictates that we reverse and order a new trial. And third, he contends that Rone's testimony was false and misleading.

23. Dixon's repeated assertion that "[n]o evidence presented by the State, other than the testimony of Carl Rone, linked Dixon to the crime"[23] is incorrect. Bad blood between Dixon and Kevin Bell, on the one hand, and Harrigan, on the other, surfaced at the Rebel nightclub a few nights before Bell's funeral and the shooting that gave rise to Dixon's charges. The fatal shooting of Bell after the altercation at the nightclub angered Dixon, who directed that ire at Harrigan. The jury could have reasonably inferred from Dixon's palpable hostility toward Harrigan at Bell's funeral that Dixon held Harrigan responsible for Bell's death. In short order, the vehicle in which Harrigan was traveling away from the funeral was attacked by a shooter, who bore facial characteristics and skin complexion similar to Dixon's. The

_____

[22] 194 A.3d 16 (Del. 2018).
[23] Opening Br. at 17; *see also supra* note 5.

8

shots came from the front passenger side of a black Crown Victoria. Not long after that, Dixon was seen alighting from the front passenger side of a black Crown Victoria, running from police, and discarding an object that turned out to be a 9-millimeter Ruger—the type of gun used in the shooting. Dixon admitted he had been in possession of the gun for the past day or two. All of these facts could have been—and were—established by witnesses other than Rone. And, more to the point, a reasonable juror could find that, based on this evidence, Dixon was guilty of the crimes charged beyond a reasonable doubt.

24. This same evidence, established by and through witnesses other than Rone, is also relevant to Dixon's contention that we are bound by *Fowler* to reverse the Superior Court and grant Dixon a new trial. For starters, we note that *Fowler*'s procedural posture differed from the posture of this case in one material—and ultimately dispositive—respect. *Fowler* involved a convicted defendant's first motion for postconviction relief; Dixon's motion is a "[s]econd or subsequent" motion and is therefore subject to Rule 61(d)(2)'s procedural bars. In particular—and as Dixon recognizes—to avoid summary dismissal of his motion, under Rule 61(d)(2)(i), Dixon must "plead[] with particularity that new evidence exists that creates a strong inference that [he] is actually innocent in fact of the acts underlying the charges of which he was convicted."[24] This Dixon has not done.

---

[24] Super. Ct. Crim. R. 61(d)(2)(i).

25.     As we recently observed in *Purnell v. State*,

[s]atisfying the actual innocence test is, by design, a heavy burden, and such meritorious claims are exceedingly rare. . . .  [The] new evidence must speak with such persuasive force as to convince the reviewing court that, when considered in the context of all the relevant evidence by a properly instructed jury, it is such as will probably change the result if a new trial were granted.[25]

26.     We also recognized in *Purnell* that

a body of new evidence that goes *only* to the weight or credibility of that which was presented to the jury is almost never adequate to meet the demanding bar for being granted a new trial.  Generally, to be more than "merely" impeaching or cumulative, new evidence attacking the weight or credibility of a witness's trial evidence attacks the credibility of the witness in the case at bar specifically, rather than impeaching the witness's credibility in general.[26]

27.     Here, Dixon's claim clears neither of these hurdles.  Dixon has not shown how Rone's criminal convictions undermined the credibility of Rone's testimony *in this case*.  Nor, as we have already explained, does the new evidence speak with such result-changing force as would justify a new trial.  Moreover, although Dixon contends that Rone's testimony was "false and misleading," he does so, not on the basis of the "new evidence," but, as discussed below, on the basis of literature that was available to him at the time of his trial.

28.     *Fowler* is also distinguishable on more substantive grounds.  For instance, in *Fowler*, we were swayed by the fact "both strains of the key evidence

---

[25] *Purnell v. State*, 2021 WL 2470511, at *37 (Del. June 17, 2021) (footnotes omitted).
[26] *Id*. at *36 (emphasis in original) (footnotes omitted).

10

the State used to prove Fowler was the shooter," which included Rone's purportedly tainted testimony, "ha[d] been called into question."[27] In this case, however, the key evidence the State used to prove that Dixon was the shooter, other than that offered by Rone, was admissible evidence and not subject to the taint of *Jencks*[28] violations as was the case in *Fowler*. Dixon's only quibble with the evidence that came from witnesses was that it was "weak" and "circumstantial."[29] As explained above, we disagree with that characterization.

29. Finally, we are not persuaded by Dixon's argument that, based largely on the authority of a 2009 National Academy of Science report, the nature of Rone's ballistics analysis was so subjective as to render the new impeachment evidence decisive. Dixon had the opportunity to highlight the subjective nature of toolmark analysis at his trial, which occurred three years after the publication of the NAS report, and chose not to do so. We decline to expand the field of our inquiry into areas that Dixon chose not to explore at trial.

30. In sum, we find no abuse of discretion in the Superior Court's denial of Dixon's motion for postconviction relief.

---

[27] *Fowler*, 194 A.3d at 18.

[28] *See Jencks v. United States*, 353 U.S. 657, 668 (1957) (holding that a defendant is entitled, upon demand at the time of cross-examination, to inspect statements made by government witnesses to government officials if the contents of the statements relate to the subject matter of examination at trial); *see also Hooks v. State*, 416 A.2d 189, 200 (1980).

[29] Opening Br. at 5.

11

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior

Court is AFFIRMED.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice